Slip Op. 15-141

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: Richard K. Eaton, Judge |
| | : | |
| AMERICAN HOME ASSURANCE COMPANY, | : | Consol. Court No. 09-00401 |
| | : | |
| Defendant. | : | |
| | : | |

## OPINION

[Plaintiff's motion for summary judgment is granted, in part, and defendant's cross-motion for summary judgment is granted, in part.]

Dated: December 17, 2015

*Edward F. Kenny* and *Beverly A. Farrell*, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, NY, argued for plaintiff. With them on the brief were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Amy M. Rubin*, Senior Trial Counsel, and *Justin R. Miller*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice.  Of counsel on the briefs were *Melissa Erny*, *Brandon T. Rogers*, and *Kyle Gormon*, Office of Assistant Chief Counsel, United States Customs and Border Protection, of Indianapolis, IN.

*Herbert C. Shelley*, *Michael T. Gershberg*, and *Mark F. Horning*, Steptoe & Johnson LLP, of Washington, DC, argued for defendant.

EATON, Judge:  This matter is before the court on the cross-motions for

summary judgment of plaintiff United States ("plaintiff" or "the Government"), on behalf of the

United States Customs and Border Protection Agency ("Customs"), and defendant American

Home Assurance Company ("defendant" or "AHAC").  *See* Pl.'s Mot. for Summ. J. (ECF Dkt.

No. 76); Def.'s Mot. for Summ. J. (ECF Dkt. No. 78).  Jurisdiction lies pursuant to 28 U.S.C.

§ 1582(2) (2012) ("The Court of International Trade shall have exclusive jurisdiction of any civil

action which arises out of an import transaction and which is commenced by the United States

. . . to recover upon a bond relating to the importation of merchandise required by the laws of the

United States or by the Secretary of the Treasury.").

In this consolidated action,[1] the United States seeks to recover on bonds issued by AHAC

securing unpaid duties on garlic, mushrooms, and potassium permanganate imported into the

United States from the People's Republic of China ("PRC").  Specifically, the Government

claims that AHAC is liable for duties up to the amounts of the bonds,[2] and for (1) pre-liquidation

interest pursuant to 19 U.S.C. § 1677g (2006);[3] (2) prejudgment statutory interest pursuant to

§ 580; (3) post-liquidation interest under § 1505(d) for non-payment of the duties; (4) equitable

prejudgment interest; and (5) post-judgment interest under 28 U.S.C. § 1961.  *See* Mem. in Supp.

of Pl.'s Mot. for Summ. J. 6 (ECF Dkt. No. 76) ("Pl.'s Br.").  By its cross-motion, with the

exception of post-judgment interest, defendant disputes these claims.  *See* Mem. of Law in Supp.

of Def.'s Mot. for Summ. J. (ECF Dkt. No. 78) ("Def.'s Br.").

---

[1]     This consolidated action also covers court numbers 09-442, 09-491, 10-002, 10-003, 10-311, and 11-206.

[2]     In addition to interest, the United States seeks to recover $27,406,336.90 in antidumping duties secured by customs bonds issued by AHAC.  *See* Def.'s Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ¶¶ 12, 34, 52, 69, 86, 107, 121, 225, 232 (ECF Dkt. No. 78) ("Def.'s Statement").

[3]     As shall be seen, the United States seeks recovery of pre-liquidation interest pursuant to 19 U.S.C. § 1677g only in case 09-491.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. 39 n.42 (ECF Dkt. No. 92) ("Pl.'s Resp. Br.") ("But for the 'final and conclusive' nature of the 19 U.S.C. § 1677g interest charge in case 09-491, the Government would not be entitled to interest under 19 U.S.C. § 1677g under these facts.  The Government concedes that AHAC does not owe 19 U.S.C. § 1677g interest in cases 09-401, 09-442, 10-002, 10-003, 10-311, and 11-206.").

For the reasons set forth below, plaintiff's motion for summary judgment is granted, in part, and defendant's cross-motion for summary judgment is granted, in part.

## STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "When both parties move for summary judgment, the court must evaluate each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *JVC Co. of Am., Div. of US JVC Corp. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000). To defeat summary judgment "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (internal quotation marks and citation omitted).

## BACKGROUND

The facts described below have been taken from the parties' statements of undisputed material facts. *See* Def.'s Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried (ECF Dkt. No. 78) ("Def.'s Statement"). Citation to the record is provided where a fact, although not admitted in the parties' papers, is uncontroverted by record evidence.

In each of these seven cases, the bonds under which the Government seeks recovery[4] were issued by AHAC—a company authorized to issue surety bonds—to secure the duties due on entries for four different importers between February 2001 and March 2002. *See* Def.'s

---

[4]      These seven consolidated cases comprise a total of 336 entries. *See* Pl.'s Br. Addendum: Pl.'s Statement of Undisputed Material Facts ¶ 1 ("Pl.'s Statement").

Statement ¶¶ 7, 9.  Each importer defaulted on payment of antidumping duties owed to Customs

and has since disappeared.  According to AHAC, the defaults were intentional and part of "a

massive scheme of fraud by the exporters of the Chinese products and their importers" to avoid

antidumping duties by obtaining surety bonds for entries made by new shippers[5] and importers,

which had no intention of remaining in business long enough to pay the assessed duties.  *See*

Def.'s Br. 2.

      Until 1999, AHAC issued customs bonds through an underwriting agent, C.A. Shea &

Company, Inc. ("Shea").  *See* Def.'s Statement ¶ 1.  Beginning in 1999, AHAC engaged a

different underwriting agent, Global Solutions Insurance Services, Inc. ("GSIS"), to "underwrite

bonds covering regular customs duties and antidumping duties for AHAC."  Def.'s Statement

¶ 2.  GSIS underwrote all of the bonds for AHAC at issue in this case.  *See* Def.'s Statement ¶ 2.

      An important statutory provision in this case pertains to notice that liquidation of

imported merchandise[6] has been suspended.  *See* 19 U.S.C. § 1504(c).  The subsection states,

"[i]f the liquidation of any entry is suspended, the Secretary[7] shall by regulation require that

notice of the suspension be provided, in such manner as the Secretary considers appropriate, to

---

[5]     "Upon request, [the United States Department of] Commerce is required by
statute to perform administrative reviews 'for new exporters and producers' whose sales have not
previously been examined."  *Jinxiang Yuanxin Imp. & Exp. Co. v. United States*, 39 CIT __, __,
Slip Op. 15-22, at 8 (2015) (quoting 19 U.S.C. § 1675(a)(2)(B)).

[6]     "*Liquidation* means the final computation or ascertainment of duties on entries
for consumption or drawback entries."  19 C.F.R. § 159.1 (2015); *see also Shinyei Corp. of Am.
v. United States*, 524 F.3d 1274, 1276–77 (Fed. Cir. 2008).

[7]     By regulation Customs has the duty to provide the requisite notice.  *United States
v. Great Am. Ins. Co. of N.Y.* (*Great Am. II*), 738 F.3d 1320, 1329 (Fed. Cir. 2013); 19 C.F.R.
§ 159.12(2)(c) (2009) ("If the liquidation of an entry is suspended as required by statute or court
order, as provided in paragraph (a)(2) of this section, the port director promptly shall notify the
importer or the consignee and his *agent and surety* on Customs Form 4333-A, appropriately
modified, of the suspension." (emphasis added)).

the importer of record or drawback claimant, as the case may be, *and* to any authorized agent and

surety of such importer of record or drawback claimant." *Id.* (emphasis added).  The

significance of such notice is that it would have alerted AHAC to the potential for increased

antidumping duty liability following the completion of the administrative reviews.[8]

According to Customs, its automated commercial system was, and continues to be,

programmed to generate notices of suspension of liquidation to sureties.  Def.'s Statement ¶ 24.

Prior to May 11, 2005, however, the system was not programmed to issue Customs Form 4333-A

notices of suspension of liquidation to sureties other than to those sureties issuing continuous

bonds[9] unless the sole bond in the system was a single transaction bond.[10]  *See* Def.'s Statement

¶ 24.  In other words, in those situations where multiple sureties insured individual entries, only

the surety that issued a continuous bond would receive a notice of suspension.  Thus, under

circumstances where there were multiple entries each secured by a single transaction bond and a

---

[8]        Liquidation of the entries was suspended because the entries at issue were the subject of administrative reviews.  *See United States v. Am. Home Assurance Co.* (*AHAC I*), 35 CIT __, __, Slip Op. 11-57, at 3 (2011) ("Upon the request for an administrative review for each [period of review], liquidation of the entries subject to each review . . . [is] suspended.").  The reason "[l]iquidation is suspended upon a request for administrative review [is] to 'enable . . . Commerce to calculate assessment rates for the subject entries . . . , which are then applied by Customs pursuant to liquidation instructions received from Commerce' after it publishes the final results of the review."  *Id.* at __, Slip Op. 11-57, at 9 (quoting *SSAB N. Am. Div. v. U.S. Bureau of Customs & Border Prot.*, 32 CIT 795, 798, 571 F. Supp. 2d 1347, 1351 (2008)).

[9]        "A 'continuous bond,' as compared to a 'single transaction bond,' covers 'liabilities resulting from multiple import transactions over a period of time, such as one year.'"  *United States v. Am. Home Assurance Co.* (*AHAC II*), 789 F.3d 1313, 1316 n.2 (Fed. Cir. 2015) (quoting *Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs & Border Prot.*, 30 CIT 1838, 1839, 465 F. Supp. 2d 1300, 1302 (2006)).

[10]       A "'single [transaction]' bond . . . cover[s] the obligations arising from one entry."  *Nat'l Fisheries*, 30 CIT at 1839, 465 F. Supp. 2d at 1302.  These seven consolidated actions involve a total of 336 single transaction bonds.  Pl.'s Statement ¶ 7.

continuous bond, the sureties that issued single transaction bonds would not have been given the statutorily-required notice.

In five of the seven consolidated cases (court numbers 09-401, 09-442, 09-491, 10-002, and 10-311), AHAC issued only single transaction bonds, while another surety issued the continuous bonds. *See* Def.'s Statement ¶ 8. Thus, no notice of suspension of liquidation was provided to AHAC by Customs' automated system in these five cases. *See* Def.'s Statement ¶¶ 25–26, 44–45, 62–63, 80–81, 99–100. In the two remaining cases (court numbers 10-003 and 11-206), AHAC issued both single transaction bonds and continuous bonds to secure the entries at issue. Def.'s Statement ¶ 8. In these cases, Customs' automated system generated notices to AHAC because it had issued a continuous bond. Neither AHAC nor GSIS, its underwriting agent for the applicable bonds, however, directly received such notice. *See* Def.'s Statement ¶¶ 114, 128. Rather, in these two cases, notice was sent to Shea, AHAC's previous underwriter for unrelated bonds, who had no relationship to the bonds at issue in this case. Def.'s Statement ¶¶ 114, 128.

All of the bonds issued by AHAC secured the duties eventually owed on imported merchandise that was subject to antidumping duty orders issued by the United States Department of Commerce ("Commerce" or "the Department").[11] *See* Def.'s Statement ¶ 6. In 2004 and 2005, after the importers defaulted on the antidumping duties owed on all of the entries in this action, Customs demanded payment from AHAC, which AHAC timely protested.[12] *See* Def.'s Statement ¶ 10. AHAC filed Freedom of Information Act ("FOIA") requests for "all the

---

[11]     It is undisputed that AHAC's agents knew the bonds secured entries subject to both regular and antidumping duties. *See* Def.'s Statement ¶ 2.

[12]     AHAC filed protests in all of the consolidated cases (i.e., court numbers 09-401, 09-442, 09-491, 10-002, 10-003, 10-311, 11-206). Decl. of Herbert C. Shelley in Supp. of Mot. for Summ. J. ¶¶ 19, 41, 46, 52, 56, 60, 65 (ECF Dkt. 78-42) ("Shelley Decl.").

documentation relevant" to the demands for payment, to which, according to AHAC, Customs

was slow in responding.[13]  *See* Def.'s Br. 8.  Once AHAC supplemented its protests with the

information received in response to its FOIA requests, and after additional delays, Customs

denied the protests in all but two cases.[14]  *See* Def.'s Statement ¶ 11.  AHAC did not appeal any

of these protest denials to this Court.  Customs commenced these collection actions in this Court

between September 2009 and October 2010, close to the six-year statute of limitations for filing

collections action.  *See* 28 U.S.C. § 2415(a).  Shortly after the Government brought these

collection actions to recover the unpaid duties on the bonds, AHAC executed time-limited

waivers of the statute of limitations for the entries covered by court numbers 09-491 and 10-

311.[15]  Def.'s Statement ¶¶ 160, 162.

Earlier in these proceedings, AHAC sought dismissal of the Government's action,

arguing the case should be dismissed because the company did not receive notice of the

suspension of liquidation of some entries.  *See United States v. Am. Home Assurance Co.* (*AHAC

I*), 35 CIT __, __, Slip Op. 11-57, at 5 (2011).  Specifically, AHAC argued that, because it failed

to receive notice of suspension as required by 19 U.S.C. § 1504(c), liquidation of the entries was

not actually suspended.  Mem. in Supp. of Def.'s Mot. to Stay Discovery and in Opp'n to Pl.'s

Mot. for Stay 2–3 (ECF Dkt. No. 28) ("Def.'s Mot. to Stay").  Because, according to AHAC,

---

[13]      AHAC filed FOIA requests for all of the consolidated cases (i.e., court numbers 09-401, 09-442, 09-491, 10-002, 10-003, 10-311, 11-206).  Shelley Decl. ¶¶ 18, 40, 45, 51, 55, 59, 64.  Customs failed promptly to provide the requested documentation in response to AHAC's FOIA request related to Protest No. 2704-04-102014 for eighty-four entries in court number 09-401.  Def.'s Statement ¶ 190.

[14]      AHAC's protests remain suspended in court numbers 10-002 and 10-311.  *See* Pl.'s Resp. Br. 23 n.28.

[15]      As shall be discussed in greater detail below, AHAC now argues its waivers of the statute of limitations of 28 U.S.C. § 2415(a) were ineffective because the statute of limitations is jurisdictional in nature and thus cannot be waived.  *See* Def.'s Br. 25.

there was no suspension of liquidation, the entries were deemed liquidated by operation of law

one year after entry pursuant to § 1504(a)(l)(A).  Def.'s Mot. to Stay 3.  Consequently, AHAC

insisted the Government's claims were barred by the six-year statute of limitations that started to

run when the entries were deemed liquidated.  Def.'s Mot. to Stay 3.

The court disagreed, holding that a failure of Customs to provide a surety notice of

suspension of liquidation does not vitiate a valid suspension.  *See AHAC I*, 35 CIT at __, Slip Op.

11-57, at 11 ("Because it is clear that the giving of notice is not a condition precedent to a

suspension of liquidation, the failure to give notice does not prevent an otherwise valid

suspension.").  The court further held, however, that failure to provide notice could give a surety

an affirmative defense to liability on the bonds if the surety could demonstrate it was prejudiced

by the lack of notice.  *See id.* at __, Slip Op. 11-57, at 13–14.


## DISCUSSION

## I.   CERTAIN OF THE GOVERNMENT'S CLAIMS ARE BARRED

### A.   Lack of Notice Does Not Invalidate a Suspension of Liquidation

Notwithstanding the court's prior ruling that a lack of statutory notice does not vitiate a

suspension of liquidation, AHAC renews its argument here, asking the court to reconsider its

holding.  *See id.* at __, Slip Op. 11-57, at 8.  For AHAC, the lack of notice rendered all of the

entries in this action "deemed liquidated by operation of law one year from the dates of entry,

and Customs' causes of action accrued on those dates."  Def.'s Br. 19.  According to AHAC,

because "Customs failed to file any of its complaints within the six-year statute of limitations

running from those deemed liquidation dates[,] . . . the [G]overnment's claims are time-barred."

Def.'s Br. 19–20.

The court declines AHAC's invitation to reconsider its prior ruling, and reaffirms its holding in *AHAC I*.  *See AHAC I*, 35 CIT at __, Slip Op. 11-57, at 13–14.  The proper vehicle by which to raise these arguments was a motion for reconsideration pursuant to USCIT R. 59(e) within "30 days after the entry of the judgment" in *AHAC I*, not at the summary judgment phase.  *See* USCIT R. 59(e).  Further, it should be noted that in its papers, AHAC makes no new arguments for the court to consider.  Accordingly, the court continues to find its ruling in *AHAC I* to be correct and will not disturb it now.  *See AHAC I*, at __, Slip Op. 11-57, at 9–10; *see also United States v. Great Am. Ins. Co. of N.Y.* (*Great Am. II*), 738 F.3d 1320 (Fed. Cir. 2013).

### B. Because the Entries Subject to the Department's Notices of Rescission Were Deemed Liquidated Following Publication of the Notices, the Government's Suit Is Untimely As to Those Entries

AHAC argues the Government's claims in court numbers 10-002 and 10-003 and as to certain entries in 10-311 are untimely.  *See* Def.'s Br. 20.  In these three cases, Commerce partially rescinded its administrative reviews of the antidumping duty orders covering preserved mushrooms from the PRC exported by Raoping Xingyu Foods Co., Ltd. and fresh garlic from the PRC[16] exported by Clipper Manufacturing Ltd.  *See*; *Certain Preserved Mushrooms from the PRC*, 67 Fed. Reg. 53,914 (Dep't of Commerce Aug. 20, 2002) (notice of partial rescission of antidumping duty administrative review); *Fresh Garlic from the PRC*, 68 Fed. Reg. 4,758 (Dep't of Commerce Jan. 30, 2003) (final results of antidumping duty administrative review and rescission of administrative review in part).

---

[16]     The rescission as to Clipper Manufacturing Ltd. covered thirty of the seventy-nine entries of fresh garlic at issue in court number 10-311.  *See* Def.'s Statement ¶¶ 102–03.  For these entries, it is undisputed that the Government did not file its case within the six-year limitations period, regardless of the date of liquidation.  As shall be seen, however, AHAC executed a waiver of the statute of limitations permitting plaintiff to file its claim beyond the six-year limit, which AHAC now insists was ineffective.

AHAC claims that publication of the notices of the partial rescissions of these administrative reviews triggered the beginning of the six-month period in which Customs must liquidate entries. *See* Def.'s Br. 23. According to AHAC, because Customs did not liquidate the entries within this six-month period, they were deemed liquidated, which, in turn, commenced the six-year statute of limitations for pursuing collection of duties on the entries. *See* Def.'s Br. 23 (citing *United States v. Great Am. Ins. Co. of N.Y.* (*Great Am. I*), 35 CIT __, __, 791 F. Supp. 2d 1337, 1367–68 (2011), *rev'd in part*, 738 F.3d 1320 (Fed. Cir. 2013)). For AHAC, because Customs failed to file its collection actions in court numbers 10-002, 10-003, and 10-311 within the six-year limitations period from the dates of deemed liquidation, "Customs is time-barred from collecting any monies pertaining to the respective entries." Def.'s Br. 23 (citing *Great Am. I*, 35 CIT at __, 791 F. Supp. 2d at 1368).

The Government maintains, however, "the notices of partial rescission did not lift the statutory suspension, nor did they notify Customs that the statutory suspension was lifted." Pl.'s Resp. to Def.'s Mot. for Summ. J. 13–14 (ECF Dkt. No. 92) ("Pl.'s Resp. Br."). Rather, for plaintiff, the notice that lifted the suspension and notified Customs "came later in the form of notice of the final results of the administrative review." Pl.'s Resp. Br. 14.

The court finds plaintiff's arguments to be meritless and thus holds that the publication of the notices of partial rescission in the Federal Register lifted the suspension of liquidation as to the relevant entries for purposes of 19 U.S.C. § 1504(d). This being the case, the statute of limitations began to run at the time the entries were deemed liquidated.

The statute "requires Customs to liquidate entries within six months of receiving 'notice' that a suspension of liquidation of such entries has been removed." *NEC Solutions (Am.), Inc. v. United States* (*NEC II*), 411 F.3d 1340, 1344 (Fed. Cir. 2005) (citing 19 U.S.C. § 1504(d)). "If Customs fails to timely liquidate the entries under the statute, the entries are deemed liquidated at

the rate asserted at the time of entry." *Id.* (citing *Fujitsu Gen. Am., Inc. v. United States*, 283 F.3d 1364, 1376 (Fed. Cir. 2002)). "Thus, in order for a deemed liquidation to occur, (1) the suspension of liquidation that was in place must have been removed; (2) Customs must have received notice of the removal of the suspension; and (3) Customs must not liquidate the entry at issue within six months of receiving such notice." *Fujitsu*, 283 F.3d at 1376. The Federal Circuit has explained, "[t]o be sufficient for purposes of § 1504(d), the 'notice' must be 'unambiguous' that the suspension of liquidation has been lifted, but does not need to include specific liquidation instructions from Commerce to Customs." *NEC II*, 411 F.3d at 1344 (citing *Fujitsu*, 283 F.3d at 1364; *Int'l Trading Co. v. United States*, 281 F.3d 1268, 1276 (Fed. Cir. 2002)). The proper inquiry is therefore whether "a reasonable Customs official would have read the [notice] to provide notification that any suspension of liquidation on the [subject] entries had been removed." *See id.* at 1346.

Moreover, in *Great American I*, this Court held that a suspension[17] is actually removed when a notice of partial rescission is published in the Federal Register. *See Great Am. I*, 35 CIT at __, 791 F. Supp. 2d at 1364–65. The *Great American I* Court adopted its rule based on the Federal Circuit's rationale that "the suspension of liquidation was removed when the mechanism by which the suspension was initiated was no longer in effect." *Id.* at 1363.

The notice of partial rescission that AHAC contends provided unambiguous notice to Customs that the suspension of liquidation had been lifted on the entries of preserved mushrooms states:

---

[17]      Unlike this Court's recent decision in *United States v. Am. Home Assurance Co.* (*AHAC V*), 39 CIT __, ___, Slip Op. 15-120 (2015), this is not a case where an injunction against liquidation was entered as the result of a challenge to a final determination by Commerce being filed in this Court.

> Accordingly, we are rescinding in part this review of the antidumping duty order
> on certain preserved mushrooms from the [PRC] as to Compania Envasadora,
> China Processed and Raoping Xingyu.  This review will continue with respect to
> Gerber, Green Fresh, Shantou Hongda and Shenxian Dongxing.

*Certain Preserved Mushrooms*, 67 Fed. Reg. at 53,914.  Similarly, the notice of partial rescission

of the review of the antidumping duty order on fresh garlic from the PRC reads:

> [W]e are rescinding this administrative review as it applies to Clipper.  With this
> rescission, we will instruct the Customs Service to liquidate the entries during the
> period of review of subject merchandise from Clipper in accordance with [19
> C.F.R. § 351.213(d) (2003).[18]]

*Fresh Garlic*, 68 Fed. Reg. at 4,759.  The notice of partial rescission of the review of the

antidumping duty order on potassium permanganate from the PRC, affecting only court number

09-442, provides:

> The Department is rescinding its review of the companies named in Carus'
> request for review because Carus has withdrawn its request. . . . Because
> Groupstars Chemicals, LLC is not a PRC exporter of the subject merchandise, and
> failed to identify any PRC exporter(s) of the subject merchandise in its review
> request, and with Carus' withdrawal of its review requests, the Department is
> rescinding this review with respect to Groupstars Chemicals, LLC.

*Potassium Permanganate From the PRC*, 68 Fed. Reg. 58,307 (Dep't of Commerce Oct. 9,

2003) (rescission of antidumping duty administrative review).  For AHAC, these notices had the

effect of both removing the suspension and giving Customs notice of the removal.  *See* Def.'s Br.

14–15, 23–24.

The Government disputes AHAC's claim that the publication of the rescissions in the

Federal Register served as unambiguous notice.  Rather, plaintiff argues "[t]he notice that

actually lifted the suspension and served to notify Customs came later in the form of notice of

---

[18]     "If the Secretary rescinds an administrative review (in whole or in part), the
Secretary will publish in the Federal Register notice of 'Rescission of Antidumping
(Countervailing Duty) Administrative Review' or, if appropriate, 'Partial Rescission of
Antidumping' (Countervailing Duty) Administrative Review."  19 C.F.R. § 351.213(d)(4).

the final results of the administrative review as to cases 10-002 and 10-003, and in the form of

liquidation instructions from Commerce as to the 30 entries in 10-311."  *See* Pl.'s Resp. Br. 14.

The Government concedes that "a notice of partial rescission[ ] can lift the suspension of

liquidation and give notice to Customs, similar to Commerce's notice of the final results of the

administrative review," and points to *Great American I* as one of the "rare cases" where this is

true.  *See* Pl.'s Resp. Br. 14; *see Great Am. I*, 35 CIT __, 791 F. Supp. 2d 1337.  Specifically,

plaintiff claims that, in order to satisfy the statute, the notice must explicitly state the suspension

has been lifted.

    The courts, however, have clarified that explicit language stating that a suspension has

been lifted is not required to remove a suspension of liquidation so long as "a reasonable

Customs official, with knowledge in these matters, would have read the message to provide

unambiguously that any suspension of liquidation on [the importer's] entries had been removed."

*NEC Solutions (Am.), Inc. v. United States* (*NEC I*), 27 CIT 968, 977, 277 F. Supp. 2d 1340,

1348 (2003); *see also Great Am. I*, 35 CIT at __, 791 F. Supp. 2d at 1364 ("Language explicitly

stating that a suspension is removed is not required to remove a suspension of liquidation.").

    In addition, the Government argues that, unlike here, in *Great American I*, "the notice of

partial rescission contained language indicating that liquidation instructions should follow,"

which served as an indication that the suspension of liquidation had been lifted.  Pl.'s Resp. Br.

17 (citing *Freshwater Crawfish Tail Meat From the PRC*, 67 Fed. Reg. 50,860, 50,861 (Dep't of

Commerce Aug. 6, 2002) (notice of rescission, in part, of antidumping duty administrative

review for the period September 1, 2000, through August 31, 2001)).  The Government,

however, has pointed to no case, and the court can find none, to support its claim that to end the

suspension of liquidation, proper notice must "contain[ ] indicia that liquidation should follow."

*See* Pl.'s Resp. Br. 17.  Moreover, it can hardly be the case that the omission of a statement that

liquidation instructions would follow the lifting of the suspension would have any real meaning

because the intent to issue such instructions could be presumed.  Therefore, despite the

Government's claims to the contrary, it is apparent that to be effective, the notice need not

contain language directing Customs that liquidation instructions are forthcoming.

Next, the Government contends it is significant that the partial notice of rescission in

*Great American I* "provided Customs with the appropriate duty rate to apply to the relevant

entries."  Pl.'s Resp. Br. 17.  According to the Government, "[b]y contrast, the notices of partial

rescission in cases 10-002, 10-003, and the 30 entries in 10-311, contained no such information

and, thus, could not and did not lift the suspension."  Pl.'s Resp. Br. 17.  The Federal Circuit,

however, has rejected this argument, holding that the duty rate need not be included in the notice

for purposes of 19 U.S.C. § 1504(d).  *See NEC II*, 411 F.3d at 1345 ("[N]either the statute nor

our precedent requires that the duty rate be included in the notice in order to satisfy the

requirements of 19 U.S.C. § 1504(d).").  Moreover, this argument is inconsistent with the

Government's assertion that, to be sufficient to lift the suspension of liquidation, the notice must

contain language that liquidation instructions (and hence the rate) will be forthcoming.

Further, the Government makes a related argument that, "unlike a notice of final results

or a notice of total rescission, which conclude an administrative review as to all parties, a notice

of partial rescission suffers from a contextual ambiguity—the administrative review will

continue as to some exporters."  Pl.'s Resp. Br. 14.  Thus, for plaintiff, without clear direction to

Customs that liquidation should follow, "Customs has no way of knowing whether the exporters

named in the notice of partial rescission remain subject to a country-wide antidumping rate," and

therefore "must await the results of the administrative review."  *See* Pl.'s Resp. Br. 15.  Why

alerting Customs to the rate to which the merchandise is subject should be a prerequisite to

starting the deemed liquidation clock, however, is unclear.  As noted, explicit language directing

Customs that liquidation will follow is unnecessary, as is the specific duty rate at which the

entries will be assessed.  All the law requires is that Customs be given notice that the suspension

has been lifted.  Thus, while the context may be ambiguous, the effect of these notices of partial

rescission is not.  *See NEC II*, 411 F.3d at 1345, *Fujitsu*, 283 F.3d at 1381–83; *Int'l Trading*, 281

F.3d at 1275–76; *Great Am. I*, 35 CIT at __, 791 F. Supp. 2d at 1364.

Accordingly, the court holds that Commerce's publication of the notices of partial

rescission in the Federal Register was sufficient, for purposes of 19 U.S.C. § 1504(d), to remove

the suspension of liquidation of the entries in court numbers 10-002 and 10-003 and certain

entries in 10-311.  In addition, the publication of the notices in the Federal Register constituted

notice to Customs that the suspensions of liquidation had been lifted as to those entries.  Thus,

the first two requirements of § 1504(d) were satisfied.  Because Customs failed to liquidate

within six months of the date of publication of the notices of rescission in the Federal Register,

these entries were liquidated by operation of law at the entered rates, at which time the

Government's cause of action on the bonds began to accrue.  Having failed to bring its collection

actions within six years of the dates these entries were deemed liquidated, the Government's

right to collect any duties from AHAC on the entries in court numbers 10-002, 10-003, and thirty

of the seventy-nine entries of fresh garlic in court number 10-311 is time-barred.  *See* 28 U.S.C.

§ 2415(a).

## C.  Waivers of the Statute of Limitations

As noted, AHAC executed time-limited waivers of the statute of limitations in court

numbers 09-491 and 10-311, covering a total of 190 entries.  In accordance with the waivers'

terms, the Government was permitted to file its collection actions on the bonds covering these

190 entries within an extended period beyond the six-year statute of limitations.  The statute

providing the six-year limitations period on a collection action reads, in relevant part:

> [E]very action for money damages brought by the United States or an officer or
> agency thereof which is founded upon any contract express or implied in law or
> fact, shall be barred unless the complaint is filed within six years after the right of
> action accrues or within one year after final decisions have been rendered in
> applicable administrative proceedings required by contract or by law, whichever
> is later.

28 U.S.C. § 2415(a).  AHAC now claims its waivers were ineffective because the statute of

limitations set forth in § 2415(a) is jurisdictional in nature, and therefore cannot be waived.

Def.'s Br. 25.  As a result, for AHAC, the Government's suit seeking recovery on the bonds is

untimely.

The court finds AHAC's argument unconvincing and holds the limitations period in

§ 2415(a) is non-jurisdictional, and therefore waivable.  Accordingly, the Government's suits in

court numbers 09-491 and 10-311 were timely brought.

The primary purpose of most statutes of limitations is "to protect defendants against stale

or unduly delayed claims.  Thus, the law typically treats a limitations defense as an affirmative

defense that the defendant must raise at the pleadings stage and that is subject to rules of

forfeiture and waiver."  *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008)

(citing *United States v. Kubrick*, 444 U.S. 111, 117 (1979)).  On the other hand, if a statute of

limitations is jurisdictional, it is not waivable because the court is divested of subject matter

jurisdiction at the expiration of the limitations period.

A statute of limitations is not jurisdictional "unless Congress provides a 'clear statement'

to that effect."  *United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1632 (2015) (quoting *Sebelius

v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (describing the court's adoption of "a

'readily administrable bright line' for determining whether to classify a statutory limitation as

jurisdictional.  We inquire whether Congress has 'clearly state[d]' that the rule is jurisdictional."

(quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006)) (alteration in original))).  "[I]n case

after case, we have emphasized . . . that jurisdictional statutes speak about jurisdiction, or more

generally phrased, about a court's powers."  *Kwai Fun Wong*, 135 S. Ct. at 1633 n.4.  In other

words, for a statute of limitations to be jurisdictional, "Congress must do something special,

beyond setting an exception-free deadline, to tag a statute of limitations as jurisdictional."  *Id.* at

1632.

In *Kwai Fun Wong*, in evaluating the statute of limitations governing claims under the

Federal Tort Claims Act, 28 U.S.C. § 2401(b), the Supreme Court found "no clear statement"

that the statute was jurisdictional.  *Id.*  In analyzing the text of the statute, the Court explained

that the language of the provision "does not define a federal court's jurisdiction . . . [or] address

its authority to hear untimely suits."  *Id.* at 1633.  The Supreme Court held the statute of

limitations at issue contained "run-of-the-mill" language, a jurisdictional provision was not

included in the text of the statute's limitations provision, and the legislative history equally failed

to provide a "clear statement" specifying the statute's jurisdictional nature.  *Id.* (internal

quotation marks and citation omitted).  Accordingly, the Court concluded § 2401(b) is non-

jurisdictional.  *Id.*

In like manner, the court finds that § 2415(a) is non-jurisdictional and thus subject to

waiver.  AHAC argues the statutory text demonstrates the subsection's provisions are mandatory,

requiring the sanction of dismissal.  Def.'s Br. 25–26.  But, as the Government points out,

statutes of limitations are by their nature characterized by language that mandates the dismissal

of a claim if the time limits are not adhered to.  *See* Pl.'s Resp. Br. 22.  AHAC insists that the

language in the statute "shall be barred unless" mandates dismissal.  Def.'s Br. 25–26.  This

same argument, however, was found unconvincing in *Kwai Fun Wong*.  *Kwai Fun Wong*, 135 S.

Ct. at 1632.  The Supreme Court explained that statutes including "shall be forever barred"

language have been found to be both jurisdictional and non-jurisdictional statutes of limitations;

the inquiry is not based on words alone.[19]  *Id.* at 1634; *see also Henderson v. Shinseki*, 562 U.S.

428, 439 (2011) (finding that even though the statute at issue was cast in mandatory language, it

provided "no clear indication that Congress wanted that provision to be treated as having

jurisdictional attributes"); *Scarborough v. Principi*, 541 U.S. 401, 413 (2004).

Next, AHAC claims the jurisdictional nature of the subsection is demonstrated by the

intents and purposes behind its enactment outlined in the statute's legislative history.  Def.'s Br.

26–27.  The Supreme Court indicated in *Kwai Fun Wong*, however, that legislative history may

only rebut the non-jurisdictional presumption when it evidences a "clear statement" of

jurisdiction.  *Kwai Fun Wong*, 135 S. Ct at 1631–33 ("Finally, even assuming legislative history

alone could provide a clear statement (which we doubt), none does so here.").  AHAC has failed

to point to anything in the statute or its legislative history that constitutes a "clear statement" that

Congress intended to divest the court of jurisdiction through this limitations period.

Defendant next contends the legislative history for the subsection demonstrates that the

provision sought to achieve equality of treatment between the contract claims of private

individuals and those of the United States Government.  *See* Def.'s Br. 27 (quoting S. Rep. No.

89-1328, at 2 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2502, 2503 ("'At that hearing it was noted

that the Government litigation covered by the bill arises out of activity which is very similar to

commercial activity.  Many of the contract and tort claims asserted by the Government are

---

[19]        As mentioned, § 2401(b), the statute of limitations at issue in *Kwai Fun Wong*,
contained the language "shall be forever barred" and was nonetheless held to be non-
jurisdictional.  *Kwai Fun Wong*, 135 S. Ct at 1634–35.  Furthermore, another statute of
limitations, 15 U.S.C. § 15b, includes this language and has also been found to be non-
jurisdictional and therefore subject to equitable tolling.  *Id.* at 1634.

almost indistinguishable from claims made by private individuals against the Government.

Therefore it is only right that the law should provide a period of time within which the

Government must bring suit on claims just as it now does as to claims of private individuals.

The committee agrees that the equality of treatment in this regard provided by this bill is required

by modern standards of fairness and equity.'" (quoting H.R. Rep. No. 89-1534, at 4 (1966))).

        The Supreme Court, however, has found that a statutory provision with similar intents

and purposes was not jurisdictional, and the same is true here.  *See Kwai Fun Wong*, 135 S. Ct. at

1636–37.  That is, just as the Supreme Court in *Kwai Fun Wong* found the Federal Tort Claims

Act "treats the United States more like a commoner than like the Crown," the legislative history

AHAC cites to defeats its own argument.  *See id.* at 1637.  "[I]n stressing the Government's

equivalence to a private party, the [statute] goes further than the typical statute waiving

sovereign immunity to indicate that its time bar allows a court to hear late claims." *Kwai Fun

Wong*, 135 S. Ct. at 1638.  That a statute of limitations constitutes a waiver of sovereign

immunity is a common justification for finding a statute to be jurisdictional in nature.  The

Supreme Court has held, however, that where a statute is intended to put the United States on

equal footing with private parties, the purpose of the statute is to treat the Government as a

regular litigant.  In other words, when enacting a statute of limitations, if Congress's intent is to

treat the United States as any party engaged in commercial activity, the argument that the statute

creates a limited waiver of sovereign immunity, and thus is jurisdictional, loses its

persuasiveness.  Indeed, it cuts against the idea that the statute is jurisdictional by expressing an

intent to treat the Government like any other party.

        Further, AHAC contends that, where statutes of limitations have the purpose of achieving

a broader system-related goal, as distinct from the ordinary purpose of protecting defendants

against aged claims, the Supreme Court has found those statutes to be jurisdictional in nature.

*See* Def.'s Br. 26 (citing *John R. Sand & Gravel*, 552 U.S. at 133–34). Goals articulated for

jurisdictional statutes of limitations thus encourage "facilitating the administration of claims"

against the Government and "limiting the scope of a governmental waiver of sovereign

immunity." *John R. Sand & Gravel Co.*, 552 U.S. at 133; *see also United States v. Brockamp*,

519 U.S. 347, 352 (1997) (holding a statute of limitations was jurisdictional because, among

other reasons, "read[ing] an 'equitable tolling' exception into [the statute] could create serious

administrative problems by forcing the [Internal Revenue Service] to respond to, and perhaps

litigate, large numbers of late claims"). These considerations, however, are not of particular

concern where, as here, the Government is bringing suit against a private entity, not the other

way around.

Finally, this Court has previously suggested that the limitations period set forth in 28

U.S.C. § 2415(a) is waivable and thus non-jurisdictional. *See United States v. Canex Int'l

Lumber Sales Ltd.*, 32 CIT 407, 410 (2008) ("[The defendant] was therefore notified of the

possibility of further proceedings with regard to liquidated damages and had ample opportunity

to *execute the statute of limitations waiver* or petition for mitigation proceedings as necessary."

(emphasis added)).

Based on the forgoing, the court holds the six-year statute of limitations period in 28

U.S.C. § 2415(a) is non-jurisdictional and therefore subject to waiver. Accordingly, the time-

limited waivers executed by AHAC in court numbers 09-491 and 10-311 were effective and the

Government's collection actions with respect to the 190 entries covered by these two cases were

therefore timely brought.

## II.  AHAC MAY RAISE ITS DEFENSES

The Government contends that AHAC may not interpose its contractual defenses to

liability on the bonds because the surety failed to appeal Customs' denials of its protests to this

Court.  For plaintiff, the matters raised by AHAC in this suit were decided by the unappealed

protest denials, and therefore "became 'final and conclusive' under 19 U.S.C. § 1514(a)[20] when

AHAC failed to . . . contest the denial of its protests."  *See* Pl.'s Resp. Br. 23.  Specifically, the

Government argues:

> AHAC is precluded from defending the Government's claims on the basis
> of Customs' failure to issue personal notices of suspension of liquidation pursuant
> to 19 U.S.C. § 1504(c) and from challenging Customs' interest charges under 19
> U.S.C. §§ 1505(d) and 1677g.  These Customs decisions became "final and
> conclusive" under 19 U.S.C. § 1514(a) when AHAC failed to protest these issues
> or contest the denial of its protests in this Court.

---

[20]      Section 1514(a) specifies that:

[A]ny clerical error, mistake of fact, or other inadvertence, whether or not
resulting from or contained in an electronic transmission, adverse to the importer,
in any entry, liquidation, or reliquidation, and, decisions of the Customs Service,
including the legality of all orders and findings entering into the same, as to—

   (1) the appraised value of merchandise;

   (2) the classification and rate and amount of duties chargeable;

   (3) all charges or exactions of whatever character within the jurisdiction of the
Secretary of the Treasury;

   (4) the exclusion of merchandise from entry or delivery or a demand for
redelivery to customs custody under any provision of the customs laws, except a
determination appealable under section 1337 of this title;

   (5) the liquidation or reliquidation of an entry, or reconciliation as to the issues
contained therein, or any modification thereof, including the liquidation of an
entry, pursuant to either section 1500 of this title or section 1504 of this title;

   (6) the refusal to pay a claim for drawback; or

   (7) the refusal to reliquidate an entry under subsection (d) of section 1520 of
this title;

*shall be final and conclusive upon all persons* (including the United States and
any officer thereof) *unless a protest is filed* in accordance with this section, or
unless a civil action contesting the denial of a protest, in whole or in part, is
commenced in the United States Court of International Trade in accordance with
chapter 169 of title 28 within the time prescribed by section 2636 of that title.

19 U.S.C. § 1514(a) (emphases added).

Pl.'s Resp. Br. 23.  Thus, the Government maintains that AHAC's failure to bring suit

challenging Customs' denial of its protests prevents the surety from raising prejudicial lack of

notice as a defense in this action, and further prevents AHAC from objecting to certain interest

amounts charged to its bonds.  *See* Pl.'s Resp. Br. 23–24.

The court finds AHAC is not foreclosed from arguing as defenses in this collection action

that: (1) it was prejudiced by failing to receive § 1504(c) notice; (2) § 1677g interest does not

accrue on outstanding duties secured by the bonds; (3) § 1505(d) interest does not apply to

antidumping duties; and (4) the Government is not entitled to § 580 and equitable prejudgment

interest.

A surety, of course, may protest Customs' liquidation determinations on the merchandise

for which it undertakes to secure the payment of duties.  *See* 19 U.S.C. § 1514(a).  In doing so,

however, it largely stands in the shoes of the importer, making arguments the importer could

make, such as the correct amount the importer owes on the entries secured by its bond.  *See id.*

If the protest is denied with respect to these protestable matters, the surety must appeal to this

Court or be bound, along with the importer, by the rule of finality as to the liquidation itself (i.e.,

the amount owed by the importer).  *See United States v. Utex Int'l Inc.*, 857 F.2d 1408, 1414

(Fed. Cir. 1988).

As to defenses related to its contractual obligations under a bond, however, a surety is not

precluded from raising them in a collection action brought by the Government.  This is the case

even if the defenses replicate claims it made, or could have made, in a protest brought to

determine an importer's liability on liquidation.  *See id.* ("Once the administrative decision

represented by a liquidation is made, the importer must file such a protest in order to secure

further administrative review, as well as to preserve his right to judicial review.  However, the

issue at bar does not relate to administrative review of liquidation, brought by the importer or

surety, for the time for such review is long past." (internal quotation marks and citation

omitted)).

AHAC may raise its defenses because a cause of action of the kind presented here is on

the contract of insurance, not on the entry of goods into the United States.  That is, the subject of

a protest brought by or in the shoes of an importer covers matters contained in the Tariff Act of

1930.  *See* 19 U.S.C. ch. 4.  The cause of action in a collection action on a bond, on the other

hand, does not arise under the Tariff Act of 1930; rather, its jurisdiction is separately provided

for in 28 U.S.C. § 1582(2) ("The Court of International Trade shall have exclusive jurisdiction of

any civil action which arises out of an import transaction and which is commenced by the United

States . . . to recover upon a bond relating to the importation of merchandise required by the laws

of the United States or by the Secretary of the Treasury.").

Although expressed differently at times, courts have long recognized that appeals

following protest denials, and collection actions brought by the Government, travel on different

tracks and have separate jurisdictional bases.  *See United States v. Sherman & Sons Co.*, 237

U.S. 146 (1915).  "[W]e hold that the importer is not concluded by the reliquidation order, and

when suit is brought for the amount claimed to be due he may file his plea and be heard in his

defense as in other cases, even though he did not file a protest and make the payment required in

the case of the original liquidation."  *Id.* at 158.

Customs' power to liquidate

is an incident of the fact that the assessment and collection of duties is an
administrative matter,—no notice or hearing being necessary, since the
assessment is *in rem* and against the foreign goods which are sought to be entered.
. . .  [I]f . . . it should be discovered that . . . the United States has been deprived of
its just dues, and if the goods themselves cannot be found, so as to be forfeited,
the inability to proceed *in rem* would not prevent the [G]overnment from bringing
a suit *in personam* to enforce the importer's personal liability for the debt which
accrued and which rightfully should have been paid when the foreign
merchandise was entered at the domestic port.

*Id.* at 153.

The concept that an importer's liability is fixed (i.e., "subsumed") by liquidation, but that a surety's defenses to liability on its bond are preserved, was affirmed by the Federal Circuit's holding that, under contracts of insurance, defenses necessarily "are personal to [the surety] and are separate and distinct from [an importer's] protest." *See St. Paul Fire & Marine Ins. Co. v. United States* (*St. Paul I*), 959 F.2d 960, 964 (Fed. Cir. 1992).

> [T]he [G]overnment argues that St. Paul's claims are barred because it failed to file a timely protest. However, the [G]overnment admits that if St. Paul had not filed a protest and had refused to comply with the [G]overnment's demand for payment, and the [G]overnment had proceeded to sue St. Paul, no protest would have been required to assert contractual defenses against the [G]overnment's claim. . . . The justiciability of St. Paul's claims is not dependent on [the importer's] protest, nor is it prejudiced by not being part of that protest. One way to clear away the fog is simply to look at the contract claim only—that is, apart from the appeal of [the importer's] protest.

*Id.* (citing *Utex*, 857 F.2d at 1413–14).

More recently, in *United States v. Cherry Hill Textiles, Inc.*, the Court recognized that, although Customs has the authority to make decisions impacting liquidation directly, it does not have authority to make determinations other than those authorized by § 1514. *United States v. Cherry Hill Textiles, Inc.*, 112 F.3d 1550, 1554 (Fed. Cir. 1997) ("Congress did not 'authorize the Collector to make findings of fraud' and compel the importer to defend against the fraud determination through the protest mechanism." (quoting *Sherman*, 237 U.S. at 155)).

In *Utex*, moreover, the Court held that a surety need not file a protest and deposit the demanded duties before its claims (or defenses) could be heard in a collection action. *See Utex*, 857 F.2d at 1414 ("Sentry states, without contravention, that protest and advance payment of liquidated damages were not required of defendants in a district court action for damages, prior to enactment of the Customs Courts Act of 1980, which transferred jurisdiction of actions on a

surety bond from the district courts to the Court of International Trade, 28 U.S.C. § 1582.  There

is no suggestion in the legislative history that Congress intended to change the status of the

surety in such suits.  Indeed, Sentry points out that the Customs Courts Act of 1980 contained a

new provision, 28 U.S.C. § 1583, that authorized sureties to implead third parties or file cross-

claims in actions on a bond brought under 28 U.S.C. § 1582, an opportunity that is not readily

harmonized with the [G]overnment's position that the surety must pay all claimed damages in

full before raising any defense."); *see also id.* ("It is not characteristic of either the law of surety

or the law of contracts that a defendant must routinely pay," as it must do in order to file a

protest, "the amount demanded prior to judicial determination of contractual liability.  Absent

statutory directive or clear Congressional intent to the contrary, we do not impose it.  The cases

cited by the [G]overnment referring to finality of assessment absent a timely protest all refer to

duties and related exactions subsumed in final liquidation.  We entirely agree that both sides to

this action are now barred from challenging the liquidation.  But in a suit for damages brought by

the [G]overnment, it appears clear that *historically the surety was not required to file a protest*

*and pay the full demanded damages in advance, in order to preserve its right to defend on the*

*issue of liability*.  We conclude that the 1980 legislative enactments did not change the right of

the surety to defend against a claim for liquidated damages.  Under the circumstances that here

prevail the surety was not required *to file an administrative protest and pay the damages*

*assessed*, as prerequisites to defending against the charge." (emphases added)); *United States v.*

*Toshoku Am., Inc.*, 879 F.2d 815, 818 (Fed. Cir. 1989) (explaining that, even following

liquidation, "[p]roof that the importer has complied with the conditions of the bond has

traditionally been and still remains a complete defense to a collection suit brought on the bond").

Thus, the rule found in both law and custom remains that, in a case brought by the

Government to collect under a contract of insurance, the surety is not prevented from raising

defenses to defeat the Government's claims, even those that would be protestable matters if raised by or on behalf of an importer.[21]

It is also worth noting that the rule found in *Utex* and other cases is a sensible one.  First, there are thousands of protests every year and the great majority are resolved at the administrative level using Customs' administrative procedures.  By way of contrast, there are only a handful of collection actions brought by the Government to recover on bonds securing the payment of duties.  These suits proceed without any prior administrative proceedings and, like the one now before the court, may involve a great deal of money and are subject to the usual discovery and motion practice typical of lawsuits.  Moreover, these cases will normally result in a reasoned decision at summary judgment and, in some cases, a subsequent decision with findings of fact and conclusions of law following trial.  It would be a peculiar situation indeed if

---

[21]    Citation to *Hartford Fire Ins. Co. v. United States* (*Hartford II*), 544 F.3d 1289 (Fed. Cir. 2008), does not aid the Government's case.  *See* Pl.'s Resp. Br. 24.  The *Hartford* case involved a unique set of procedural facts.  *See Hartford II*, 544 F.3d at 1290–91.  It is common for insurance companies to bring declaratory judgment actions to determine their duties and obligations under insurance contracts prior to having a claim lodged by an insured.  This is what the plaintiff sought to achieve in *Hartford*.  *See Hartford Fire Ins. Co. v. United States* (*Hartford I*), 31 CIT 1281, 1281, 507 F. Supp. 2d 1331, 1332 (2007), *aff'd*, 544 F.3d 1289 (Fed. Cir. 2008).  At the time Hartford brought its case, Customs had sent the company a statement of charges for duties owed by its defaulting importer, but the Government had not yet filed a collection action.  Acting as many insurance companies would, Hartford brought a declaratory judgment action to have its duties and obligations determined by a Court prior to the Government bringing suit.  *See Hartford II*, 544 F.3d at 1291.  Because the Court of International Trade (like all federal courts) is a court of limited jurisdiction, Hartford sought to bring its declaratory judgment action under 19 U.S.C. § 1581(i), the Court's "catch-all" jurisdictional provision.  *See Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir. 1992).  The Federal Circuit held, however, that § 1581(i) jurisdiction was not available to Hartford because it could have sought relief by protesting the bill from Customs for the duties left unpaid by the insured importer.  *Hartford II*, 544 F.3d at 1290.  The new rule expressed in *Hartford*, however, did not address an action brought by the Government seeking to enforce a contract of insurance against a surety; a case that has an entirely different jurisdictional basis.  *See* 28 U.S.C. 1582(2).  Accordingly, *Hartford* did not overrule *Utex* or *Toshoku*, or indeed even mention them.

the unreasoned determination[22] of an administrative agency could preclude a party in an action

before this Court from interposing its defenses to insurance coverage and thereby circumvent

normal court procedures.  Nor would it make much practical sense in these commercial cases to

require a surety to establish certain of its contractual rights in one forum, and then require the

surety to establish other rights under the same contract of insurance as defenses elsewhere.

Therefore, it is apparent that, despite AHAC's failure to appeal the protest denials, it is not

bound by the rule of finality and may interpose its defenses here.


### III. AHAC'S CLAIMS OF PREJUDICE

#### A.  Legal Framework

As noted in *AHAC I*, "although Customs' failure to provide notice does not invalidate the

suspensions, if AHAC was actually harmed as a result of Customs' omission, it would be entitled

to appropriate relief."  *AHAC I*, 35 CIT at ___, Slip Op. 11-57, at 13.  Generally, under insurance

law, if a surety is prejudiced by the actions of the insured,[23] then the contract of insurance may be

---

22       Typically, Customs gives no reasons when it denies a protest, but merely circles the word "[d]enied for the reason checked."  U.S. Customs & Border Prot. Form 19 (05/10), *available at* http://www.cbp.gov/sites/default/files/documents/CBP_Form_19.pdf.  As a result, these protest demands are accorded no deference.  *See United States v. Mead Corp.*, 533 U.S. 215, 228 (2001) ("The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." (alteration in original) (internal quotation marks omitted) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

23       The text on the bonds indicates that the United States is the insured.  *See, e.g.*, Def.'s Resp. to Ct.'s Order, Ex. 1, at 1 (ECF Dkt. No. 138) (Continuous Bond No. 270712146 issued by AHAC) ("In order to secure payment of any duty, tax or charge and compliance with law or regulation as a result of activity covered by any condition referenced below, we, the below named principal(s) and surety(ies), bind ourselves to the United States in the amount or amounts, as set forth below.").

voided in whole or in part.  *See generally Chapman v. Hoage*, 296 U.S. 526, 531 (1936);

Restatement (First) of Security § 128 (Am. Law Inst. 1941).

AHAC argues it was prejudiced by Customs' failure to provide the statutorily-required

notice of suspension of liquidation and, had it known of the suspensions, it would have taken

measures to mitigate its liability under the bonds.  Def.'s Br. 32–35.  Because this claim is raised

as a defense in a collection action, the burden is on AHAC to both plead and demonstrate it was

prejudiced.  *See Great Am. I*, 35 CIT at __, 791 F. Supp. 2d at 1355.  "Whether an error is

prejudicial or harmless depends on the facts of a given case."  *AHAC I*, 35 CIT at ___, Slip Op.

11-57, at 14.

With respect to the claims of prejudice, the Government contends AHAC has not

provided *any evidence* that, if the company received notice, it would have, or for that matter

could have, taken any action to decrease its risks under the bonds.  Pl.'s Br. 16–20.  AHAC,

however, maintains it has produced ample evidence that it could and would have acted, and

urges the court to dismiss the Government's claims on account of the prejudice caused by the

lack of notice.  *See* Def.'s Br. 30–35.  In other words, AHAC seeks to have its duties and

obligations under both the single transaction and continuous bonds discharged as a result of the

prejudice suffered by the Government's failure to provide the statutorily-required notice that

liquidation had been suspended.  *See* 19 U.S.C. § 1504(c).

Importantly, if a claim of prejudice is based on the failure of a government entity to

perform an act, the resulting harm must be of the sort the required action was designed to

prevent.  *See Intercargo Ins. Co. v. United States*, 83 F.3d 391, 396 (Fed. Cir. 1996) ("Prejudice,

as used in this setting, means injury to an interest that the statute, regulation, or rule in question

was designed to protect.").  The Federal Circuit recently indicated that the party seeking relief

from its obligations under a bond must demonstrate concrete, cognizable, "substantial prejudice."

*Great Am. II*, 738 F.3d at 1330.  This standard is in line with much of the law of insurance.

Notably, "[t]he theory of discharge began as a state law *defense* that a surety could assert to

avoid enforcement of its bond obligation on the grounds that the obligee (the beneficiary of the

bond) had taken improper actions which prejudiced the surety by increasing its financial risk."

*Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313 (Fed. Cir. 2011); *see also*

*Hartford Fire Ins. Co. v. United States*, 772 F.3d 1281, 1288 (Fed. Cir. 2014) (quoting *Great*

*Am. II*, 738 F.3d at 1332).  In such cases, prejudice must be established by a preponderance of

the evidence at trial.  *Fabil Mfg. Co. v. United States*, 237 F.3d 1335, 1340–41 (Fed. Cir. 2001).

Courts have generally found that the burden placed on an insurer to prove it suffered

prejudice by reason of a breach of a notice provision is a substantial one.  *Intercargo*, 83 F.3d at

396 ("A party is not 'prejudiced' by a technical defect simply because that party will lose its case

if the defect is disregarded.  Prejudice, as used in this setting, means injury to an interest that the

statute, regulation, or rule in question was designed to protect."); *Great Am. I*, 35 CIT at __, 791

F. Supp. 2d at 1359 ("Without a fact-specific demonstration of injury to an interest that the

notice provisions were designed to protect, the court cannot conclude that [the surety] has pled

*with particularity* the prejudice suffered by the lack of notice.").  For example, courts have

required that, to create a triable issue of fact with respect to the issue of prejudice due to late

notice, an insurer must demonstrate with competent evidence that it suffered a change in position

adverse to its interests.  That is, the insurer must show a substantial likelihood that it could have

defeated the underlying claim against the insured, settled the case for a smaller sum than that for

which it was ultimately settled, suffered tangible economic injury, or irretrievably lost a

substantial right or the ability to mount a defense.  *See Goodstein v. Cont'l Cas. Co.*, 509 F.3d

1042, 1058 (9th Cir. 2007); *British Ins. Co. of Cayman v. Safety Nat'l Cas.*, 335 F.3d 205, 212

(3d Cir. 2003); *In re Texas E. Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 15

F.3d 1249, 1253–54 (3d Cir. 1994); *Ins. Co. of Pa. v. Associated Int'l Ins. Co.*, 922 F.2d 516, 524

(9th Cir. 1991); *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1068–69 (2d Cir. 1993);

*Granite State Ins. Co. v. Clearwater Ins. Co.*, No. 09 Civ. 10607, 2014 WL 1285507, at *20–21

(S.D.N.Y. Mar. 31, 2014) ("[O]ne method to defeat liability under contracts for reinsurance is for

the reinsurer to prove that the delay was 'material or demonstrably prejudicial.'" (citation

omitted)).  Finally, the claimed prejudice must relate to particular bonds, not to a surety's

business in general.  *See Great Am. II*, 738 F.3d at 1330.

Therefore, in order to be released from its contractual obligations by reason of having

suffered prejudice, AHAC must demonstrate: (1) Customs failed to provide the required

statutory notice that liquidation had been suspended; (2) the purpose of the notice provision is to

protect AHAC from injury to its interest with respect to being liable on the bonds; and (3)

AHAC suffered actual prejudice with respect to its obligations on the bond due to Commerce's

failure to provide the required notice of suspension.  Moreover, to establish prejudice, "courts

'reject speculation, and require evidence of concrete detriment resulting from delay, together

with some specific harm to the insurer caused thereby.'"  *Goodstein*, 509 F.3d at 1058 (quoting

*Canron, Inc. v. Fed. Ins. Co.*, 918 P.2d 937, 941 (Wash. Ct. App. 1996)).

First, as to the notice provision, it is evident that Customs failed to provide the notice

required by § 1504(c).  Def.'s Statement ¶¶ 114–17.  The Government asserts it provided AHAC

with actual notice because Customs sent notice to AHAC's former agent, Shea.  Pl.'s Br. 16–18;

Pl.'s Resp. Br. 4.  The Government also appears to claim that AHAC had actual notice, or at

least knowledge, that its bonds secured entries subject to antidumping duties.  Pl.'s Br. 19.

These arguments, however, simply do not take the place of the notice Congress directed Customs

to give, the purpose of which was to protect sureties.  The Government's assertion that notice to

a stranger to the contracts of insurance, an agent that had been fired by AHAC and which never

informed AHAC of the notice, could be said to constitute actual notice is too much of a stretch to

be seriously considered.  In addition, the Government has produced no evidence that any AHAC

employee ever saw any of the publications in the Federal Register, that the company was under

any statutory duty to monitor such publications, or that notice to a surety by publication was

authorized.

Accordingly, the court finds the alleged service on AHAC's previous agent, Shea, instead

of GSIS, the actual agent and underwriter of the bonds, does not satisfy the notice requirements

of § 1504(c).  *See* 19 U.S.C. § 1504(c) ("If the liquidation of any entry is suspended, the

Secretary shall by regulation require that notice of the suspension be provided, in such manner as

the Secretary considers appropriate, to the importer of record or drawback claimant, as the case

may be, and to *any authorized agent and surety of such importer of record or drawback*

*claimant*." (emphasis added)).  Moreover, the statute requires that both the authorized agent and

the surety itself be given notice.  Even if there could be some argument that service on Shea was

sufficient, there is no factual dispute as to whether AHAC received notice.  The Government has

not submitted evidence sufficient to meet its burden on summary judgment as to whether it sent

the required statutory notice to AHAC.  That is, the Government's claim that it served Shea, and

its proffer of a "screen shot" dated in 2010, without more, is insufficient for a reasonable jury to

conclude AHAC received actual or constructive notice.

Second, the legislative history of § 1504(c) demonstrates an intent to protect sureties

from greater risk under bonds.  H.R. Rep. No. 95-621, at 25 (1977) ("The addition of this

subsection gives notice to the sure[t]y companies and other third parties that there is a potential

for loss.  Thus, the sureties can take appropriate measures upon receiving this notice to make

sure that at least as to continuing activities, the risk of loss will be minimized.").  Also, it is clear

that Congress, by enacting the amendments surrounding § 1504(c), endeavored to protect

"[s]urety companies, which are jointly liable with importers for additional duties, [so they] would be better able to control their liabilities.  Sureties would also be better protected against losses resulting from the dissolution of their principals in instances where there has been undue delay in liquidating entries."  *Id.* at 4.

In support of AHAC's argument that it suffered injury as a result of Customs' failure to provide notice, the company insists that the required notice "would have alerted AHAC to increased risk of loss on its bonds, which could have led AHAC to take remedial measures." Def.'s Br. 31.  AHAC maintains, moreover, that its financial risks were increased by Commerce's failure to provide notice of the suspended liquidation, principally because, had it received notice, it could have (1) demanded more collateral, (2) terminated the bonds, or (3) taken other actions to protect its import duty bond business generally.  *See* Def.'s Br. 32–35; Def.'s Resp. Br. 7–8.

The court's inquiry now turns to the question of whether AHAC has presented sufficient evidence of prejudice to be entitled to summary judgment on its defense or to create a triable issue of fact regarding its liability on the bonds.  *See AHAC I*, 35 CIT at __, Slip Op. 11-57, at 13–14.  Here, there are two types of bonds at issue, and the court will discuss AHAC's claims with respect to each separately.

### B.  Single Transaction Bonds

As to the single transaction bonds, the court finds AHAC has not shown prejudicial harm from Commerce's failure to provide it with notice of suspension as required by 19 U.S.C. § 1504(c) to prevail on summary judgment.

First, AHAC claims it could have demanded additional collateral from the importers if it was aware that liquidation had been suspended.  Def.'s Br. 34.  Defendant, however, has not

established any basis on which it could have demanded more collateral after the single

transaction bonds were executed.  As a surety, AHAC's duties and obligations under the single

transaction bonds attached when each bond was executed and each individual entry was made.

*See Great Am. II*, 738 F.3d at 1330.  AHAC has failed to provide any contractual basis by which

a post-execution demand for additional collateral from the importer would have amounted to

more than a unilateral attempt to modify its preexisting contract without offering any

consideration in return.  In addition, AHAC has provided no practical reason why any of its

importers would have felt compelled to provide additional collateral.  That is, because the

agreement to act as a surety for the importer was complete once the single transaction bonds

were executed, the importers had no reason to put up more collateral.  This holding is consistent

with the Federal Circuit's ruling in *Great American II*, where the Court rejected similar

arguments, noting that, under a single transaction bond, a surety's obligations have already

attached and it would therefore be unable to alter its liability on the bond.  *Id.*

AHAC's argument that it could have obtained, at an earlier date, experienced counsel to

investigate its liability exposure and alter future business policies accordingly, are equally

unavailing because this is irrelevant to the single transaction bonds.  *See id.* ("Great American

argues that the [G]overnment's failure to send it a separate notice of suspension injured it

because, had it gotten such a notice, it could have sought reinsurance, ceased doing business with

the importer to limit its future risk, or attempted to minimize its loss on these bonds by

participating in the administrative review of the duties at issue and arguing for a lower rate for

the entries covered by the bonds.  But the trial court correctly recognized that certain of the

identified possible actions are irrelevant to the single-transaction bonds at issue here, because

altering future business policies could not limit the risk Great American had already incurred

under the bonds in question.").  Thus, obtaining experienced counsel would not have helped

AHAC to mitigate its losses; nor would termination of any of the single transaction bonds have been possible for AHAC.  *See Great Am. I*, 35 CIT at __, 791 F. Supp. 2d at 1356 ("Termination is not a legal option for [a single transaction bond] surety.").

Further, the court rejects AHAC's contention that it suffered prejudice with respect to the single transaction bonds because it could have instructed GSIS, its underwriter, to stop issuing additional bonds securing entries of merchandise subject to antidumping duty orders.  While it is true that if AHAC had received notice it may not have issued additional single transaction bonds, this is just a reiteration of AHAC's argument regarding future business practices.  As this Court previously found in *Great American I*, "any limitations on future bond issuance by an agent do not affect the surety's liability on the [single transaction bonds] already executed on the surety's behalf."  *Id.* at __, 791 F. Supp. 2d at 1357.  Put another way, had it received notice, there is nothing that either AHAC or GSIS could have done to limit AHAC's risk under the single transaction bonds that had already been issued.

In sum, to prevail on its prejudice defense at summary judgment, AHAC must show it suffered cognizable prejudice with respect to its liability as to particular single transaction bonds (i.e., specific contracts of insurance) on account of Commerce's failure to provide notice that liquidation of the entries secured by those particular bonds had been suspended.  It has not done so.  *See Great Am. II*, 738 F.3d at 1330.

### C.  Continuous Bonds

As to the continuous bond, however, the facts are different because the bonds are different.  The *Great American I* Court

> acknowledge[d] that the situation could be quite different for [continuous bonds] because, on a [continuous bond], the surety can terminate the bond as to future entries.  In [*Hanover Ins. Co. v. United States*], the court mentions the legislative

history of the notice provisions of section 1504: "[T]he House committee explained, thus, the sureties can take appropriate measures upon receiving this notice to make sure that at least as to continuing activities, the risk of loss will be minimized."  A [continuous bond] covers entries over a period of time.  For a [continuous bond] surety, notice of a suspension, in effect, puts the surety on notice of activity by its principal that involves increased risk.  Therefore, a [continuous bond] surety has the ability to terminate the bond and prevent future liability.  In contrast, the [single transaction bonds] at issue each covered a discrete activity pursuant to a single entry.  Termination is not a legal option for a [single transaction bond] surety.

*Id.* at __, 791 F. Supp. 2d at 1356 (quoting *Hanover Ins. Co. v. United States*, 25 CIT 447, 455

(2001)) (citing 19 C.F.R. §§ 113.27, 113.61).  As noted, unlike a single transaction bond, a

continuous bond can be terminated by the surety.  19 C.F.R. § 113.27(b) ("A surety may, with or

without the consent of the principal, terminate a Customs bond on which it is obligated.  The

surety shall provide reasonable written notice to . . . the director of the port where the bond was

approved. . . .").  It is clear that the purpose of the notice provisions—to alert AHAC of the

potential for increased risk of loss and to afford it an opportunity to mitigate the loss—has more

meaning with respect to continuous bonds.[24]  Because of the possibility of termination of the

continuous bond after it received notice of the suspension of liquidation, AHAC's arguments that

it would have demanded additional collateral or terminated its continuous bond business (and

hence its existing continuous bond) have more traction.

First, a demand for more collateral is dramatically different when a continuous bond is

involved, as distinct from when a surety has issued a single transaction bond.  As noted, for the

single transaction bonds, AHAC produced no evidence of a contractual or practical reason why

---

[24]        It is worth noting the language of the regulations does not indicate that termination is available exclusively on continuous bonds.  From the text, the only indication that the regulations are intended to encompass the termination of continuous bonds is subsection c, which states: "If a bond is terminated no new customs transactions shall be charged against the bond."  19 C.F.R. § 113.27(c).  Subsection c's language could not, of course, apply to anything other than continuous bonds.  *See id.*

its importer would have complied with demands for increased collateral.  As to the continuous

bond, however, because it could have been terminated at any time by AHAC, its importers

would have been faced with complying with a demand for additional collateral or prevented

from entering their goods in the future.  In other words, because the importers needed a surety to

guarantee the payment of duties, if they wanted AHAC to continue as their surety, they would

have had to put up more collateral or face having AHAC refuse to continue acting as a surety by

terminating the continuous bond.

        The situation is put into even more relief when comparing AHAC's contractual

obligations on single transaction and continuous bonds.  With respect to a single transaction

bond, even if the statutorily-prescribed notice had been given, AHAC would have been unable to

terminate the bond or alter its contractual obligations.  By way of contrast, under a continuous

bond, had notice been provided, AHAC could have terminated the bond and avoided liability

with respect to subsequent entries.  Put another way, had AHAC received the statutorily-required

notice, it could have terminated the continuous bond and ceased acting as surety on the multiple

entries it guaranteed after receiving notice.  Thus, it is apparent that if Customs complied with its

statutorily-prescribed obligations, AHAC could have taken action to protect itself from assuming

greater liability under the continuous bond.

        Speculation as to what AHAC might have done, however, is insufficient for the company

to be relieved of its duties and obligations.  Rather, AHAC must cite to record evidence

demonstrating it would have acted to reduce its liability.  AHAC claims it could have terminated

its bonds business if it had received notice that liquidation was suspended.  The court interprets

this argument to mean that, together with other actions, AHAC could have terminated its

continuous bond.  Here, additional entries secured by the continuous bond continued to enter the

United States after AHAC should have received notice.[25]  Pursuant to the terms of the bond, the

antidumping duties owed on these subsequent entries were secured by the bond.  Under the

applicable regulations, this continuous bond could have been terminated at any time.  *Great Am.

I*, 35 CIT at __, 791 F. Supp. 2d at 1356.  Moreover, AHAC could have demanded additional

collateral from the importers as a condition for not terminating the continuous bond.  Thus,

AHAC could demonstrate it suffered prejudice by Commerce's failure to provide notice by

showing that, had it received notice, it would have (1) demanded additional collateral as a

condition for not terminating the continuous bond, or (2) terminated its continuous bond and

thereby ceasing to insure the duties due on future entries.

     With respect to the entries secured by the continuous bond, there were entries made

subsequent to when AHAC should have received notice.  AHAC, though, must do more than

claim that it would have taken action to limit its liability on the bonds had it received notice; it

must provide evidence it would have.  *See Great Am. II*, 738 F.3d at 1330–32.

---

25      When Commerce receives a request for an administrative review, liquidation of entries subject to the review are suspended.  *See* 19 U.S.C. § 1675(a)(2)(C); *Canadian Wheat Bd. v. United States*, 33 CIT 1204, 1208, 637 F. Supp. 2d 1329, 1334 n.6 (2009), *aff'd*, No. 2010-1083, Slip Op. (Fed. Cir. Apr. 19, 2011) (noting that a request for administrative review suspends liquidation pending the outcome of the review); 19 C.F.R. § 351.212(c)(1).  Here, a number of entries secured by AHAC's continuous bond entered the United States after administrative reviews were initiated and liquidation was suspended.  *See* Def.'s Resp. to Ct.'s Order, Ex. 1, at 1 (ECF Dkt. No. 138) (Continuous Bond No. 270712146 issued by AHAC); Def.'s Resp. to Ct.'s Order, Ex. 2, at 1 (ECF Dkt. No. 138) (listing entries made in 2001 and 2002 covered by Continuous Bond No. 270712146); *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 68 Fed. Reg. 14394, 14399 (Dep't of Commerce Mar. 25, 2003) (initiation of administrative review for entries of subject merchandise made between February 1, 2002 through January 31, 2003); *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocations in Part*, 67 Fed. Reg. 14696, 14697 (Dep't of Commerce Mar. 27, 2002) (initiation of administrative review for entries of subject merchandise made between February 1, 2001 through January 31, 2002).

The Government asserts that AHAC cannot demonstrate it would have taken any action

had it received notice, let alone demand more collateral or terminate the bonds.  AHAC's former

underwriting agent, Shea, testified that AHAC never requested any notices of suspension of

liquidation, that AHAC was unconcerned with such notices, and at times, Shea even discarded

the notices altogether.  *See* Decl. of Lee Barther, Pl.'s Mot. Ex. 7, at 52:15–52:20 (ECF 76-7)

("Barther Decl.").  It is worth noting, however, this evidence was taken from AHAC's

underwriting agent that had been discharged before the bonds at issue were executed.  In

addition, the Government has produced some evidence that GSIS, the actual underwriting agent

on the bonds at issue, had no procedures in place even if they received notice that liquidation was

suspended.  Pl.'s Br. 17.  Thus, while there is some evidence of how AHAC might have behaved

if it had received notice, it is hardly dispositive.  *See Great Am. II*, 738 F.3d at 1330 ("While

those admissions would not themselves automatically preclude Great American from showing

that it would have acted in this case, it was incumbent upon Great American to come forward

with evidence that in this case—unlike prior cases—notification would likely have led it to take

action, with some relevant probability of averting the alleged harm.").

To demonstrate it would have taken such steps, AHAC points out that it conducted an

investigation in 2004 after Customs sought to collect on the bonds.  Def.'s Br. 33.  Specifically,

> [i]n early 2004, AHAC began to receive demands by Customs for payment under
> the bonds covering the Chinese imports.  Shortly after the first receipt of these
> demands, AHAC replaced its usual claims handling agent with experienced bond
> claims counsel to investigate the demands and determine the company's exposure.
> If AHAC had received timely notice of suspension of liquidation years before, it
> could have conducted this investigation much earlier than it actually did.

Def.'s Br. 33.  According to AHAC, the initiation of an investigation once it knew of its

increased exposure is evidence that it would have taken action had it received the statutorily-

required notice.

In addition, the primary evidence AHAC claims demonstrates it would have taken action to mitigate its losses had it received notice is the testimony of Mark Pessolano, the Vice President in the Surety Bond Claims Department of Chartis Claims, Inc., the authorized surety claims representative for the company.  "I am responsible for managing claims against surety bonds issued by AHAC, including the bonds covering antidumping duties at issue in this litigation."  Decl. of Mark Pessolano in Supp. of Def.'s Mot. for Summ. J. ¶ 2 (ECF Dkt. 78-1) ("Pessolano Decl.").  Mr. Pessolano testified: (1) had AHAC received notice that liquidation was suspended, the company would have acted quickly to protect itself: "In my 39 years of handling surety bond claims, delay—particularly substantial delay—corresponds directly with increased likelihood of loss," Pessolano Decl. ¶ 96; (2) with adequate notice, AHAC would have conducted an investigation:

> If AHAC were timely notified of this increased risk, it would then have conducted an investigation of the importers of the Chinese products and the main customs house broker, East-West Associates, which had sought bonds on the importers' behalf from GSIS.  Those investigations could well have uncovered facts that would have prompted AHAC to take measures to prevent or mitigate its losses,

Pessolano ¶ 97; and (3) AHAC could have demanded more collateral:

> If AHAC had received timely notice of suspension of liquidation, it could have sought substantial collateral from the importer to protect it against risk of loss. . . .

> Indeed, obtaining collateral from the principal is a frequent practice by AHAC and other sureties.  The required collateral often takes the form of an irrevocable letter of credit from a highly-rated financial institution, but can also take other forms such as the posting of cash or security interests in other assets.  I have had personal involvement in several instances where AHAC obtained collateral from a bond principal in order to protect AHAC against loss and effectuate the principal's duty to perform its obligation to the obligee.

> AHAC's underwriting agreement with GSIS explicitly permitted it to seek collateral from importers.  AHAC and GSIS had no occasion to seek such collateral for bonds covering antidumping duties prior to the issuance of the bonds covering Chinese imports because there was no history of losses of sufficient magnitude to make AHAC aware it needed security.  Because any notice of suspension of liquidation would have been issued well before the importer's

refusal to pay antidumping duties, those notices could have given AHAC
sufficient advance warning to seek collateral before the importers reneged on their
obligations.

Pessolano ¶¶ 103–05 (citing Pessolano Decl. Ex. 29, at 11–13 (ECF Dkt. No. 78-29).  In

addition, Mr. Pessolano testified that "[i]f the importers of the Chinese products had

refused to provide collateral or could not be found, AHAC could have cancelled the

bonds."  Pessolano Decl. ¶ 106.

Importantly, Mr. Pessolano testified as to what AHAC actually did after it finally

received notice when Customs filed suit against the company.  Pessolano Decl. ¶ 94 ("AHAC did

not receive information from which it might have learned of this pattern of fraudulent conduct

until early 2004, when it first began receiving Customs' demands for payment under the bonds

covering the Chinese imports that are the subject of these actions.  Soon thereafter AHAC

retained experienced Customs bond counsel to conduct an investigation of the [G]overnment

claims and the failure by importers to pay antidumping duties that had given rise to those

claims.").  Mr. Pessolano also testified to actions AHAC had taken in the past when the company

learned of increased risk.  Pessolano Decl. ¶ 98 ("The possibility that AHAC would have

conducted such investigations is not speculative.  In mid-2001, AHAC became aware of

information not related to antidumping duties which caused concern that GSIS was exceeding its

underwriting authority and engaged in other practices of concern.  AHAC promptly took

corrective action in August 2001 by terminating GSIS' underwriting authority effective October

2, 2001."); *see also* Dep. of Mark Pessolano ¶¶ 72:7–73:6 (ECF Dkt. No. 78-40) ("Pessolano

Dep.") (Q: Mr. Pessolano, can you take a look at what's been marked as Pessolano Exhibit 5,

please.  A. Okay.  Q. Can you tell me what this is?  A. It's a letter from Mark Mallonee,

President of Surety Division, to [FIA Excess and Surplus Agency ("FIA")] and Global Solutions,

dated 8/3/2001, providing Notice of Termination of the agencies and Management Agreement

between FIA Global Solutions and AIG. . . . Q. Is this informing FIA and GSIS that their

agreement, Customs Bonds Agreement, is terminating?  A. That's correct.").  Thus, the essence

of Mr. Pessolano's testimony is that, as an insurance company, AHAC knew how to protect itself

from increased risk of loss and when it finally learned that it faced increased liability, it took

action to reduce it.

The Government argues that conducting an investigation would unlikely have helped

AHAC because two previous[26] investigations did not result in AHAC terminating the bonds:

"We question whether additional investigations would have actually aided AHAC since, as

AHAC admits, it had already conducted two investigations and apparently not discovered any

actionable fraudulent behavior."  Pl.'s Resp. Br. 34 n.38.  The Government is correct that in

2001, AHAC conducted an investigation when it received information relating to GSIS

potentially acting outside the scope of its underwriting authority.  Def.'s Br. 32–33.  In this

instance, however, AHAC took action by terminating its relationship with GSIS, its agent at the

time.  Def.'s Br. 32.  Moreover, the result of an investigation failing to lead to the termination of

the bond in one case does not necessarily mean that for the transactions at issue here, if given

proper notice, AHAC would not have terminated the bonds.

"In evaluating a motion for summary judgment, the evidence of the non-movant is to be

believed and all justifiable inferences are drawn in favor of the non-movant.  This standard is not

changed when the parties bring cross-motions for summary judgment, each nonmovant receiving

the benefit of favorable inferences."  *Chevron U.S.A. Inc. v. Mobil Producing Tex. & N.M.*, 281

F.3d 1249, 1252–53 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 255).  Here, AHAC has failed

---

[26]     The 2001 investigation was prompted by AHAC's concern that its then-agent,
GSIS, was exceeding its authority.  Pessolano Decl. ¶ 98.  The 2004 investigation was
commenced after AHAC began receiving demands from Customs to pay on the bonds.
Pessolano ¶ 94.

to produce sufficient evidence to prevail on summary judgment.  That is, when viewed in the

light most favorable to the Government, AHAC has not shown it was prejudiced by Customs'

failure to give notice of the suspension such that it should be relieved of its duties and

obligations under the continuous bond.  In other words, AHAC has not "show[n] that there is no

genuine dispute as to any material fact."  USCIT R. 56(a); *c.f. Ricci v. DeStefano*, 557 U.S. 557,

586 (2009) ("'Where the record taken as a whole could not lead a rational trier of fact to find for

the nonmoving party, there is no genuine issue for trial.'" (quoting *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 587 (1986))).  Here, although AHAC has produced evidence

that, as an insurance company, it had experience with risk mitigation and took some steps

following receipt of actual notice that its liabilities had grown, it has not produced sufficient

evidence entitling the company to summary judgment on its prejudice defense.

Similarly, viewing the evidence in the light most favorable to AHAC, the Government

has failed to meet its burden on its cross-motion, and is therefore not entitled to summary

judgment on AHAC's prejudice claims.  *See Ricci*, 557 U.S. at 586.  In other words, because

Customs failed to given the statutorily-prescribed notice that liquidation was suspended, there is

no actual evidence of actions AHAC took, or did not take, to limit its liability.  Rather, all of the

Government's arguments relating to AHAC's claimed prejudice are necessarily speculative

based on AHAC's actions once it received actual notice that its liability had increased; notice it

received when Customs sent the bills.  By this time, of course, it was too late for AHAC to either

demand more collateral or cancel the continuous bond.

Thus, a factual dispute remains at to what actions, if any, AHAC would have taken to

mitigate its losses had it been given the notice directed by Congress.  Accordingly, the court

finds the parties' proffered evidence is insufficient for either party to prevail at summary

judgment, and AHAC's defenses must be resolved at trial.  *See Briscoe v. LaHue*, 460 U.S. 322,

343 n.29 (1983) ("If summary judgment is denied, the case must proceed to trial.").

## IV. DEFENDANT'S LIABILITY

### A.  The Government Is Not Entitled to § 1677g Interest

The Government argues it is entitled to pre-liquidation interest pursuant to 19 U.S.C.

§ 1677g[27] on the entries at issue in court number 09-491.  *See* Pl.'s Resp. Br. 23–24.  The

Government maintains it is entitled to this interest solely "because this charge became 'final and

conclusive' by operation of 19 U.S.C. § 1514."  Pl.'s Resp. Br. 39.  As a defense[28] to these

claims, AHAC asserts that pre-liquidation interest under § 1677g is unavailable to the

Government because such interest is only assessed on cash deposits made by an importer, and

not on bonds posted by a surety.

---

[27]        Section 1677g provides:

Interest shall be payable on overpayments and underpayments of amounts deposited on merchandise entered, or withdrawn from warehouse, for consumption on and after—(1) the date of publication of a countervailing or antidumping duty order under this subtitle or section 1303 of this title, or (2) the date of a finding under the Antidumping Act, 1921.

19 U.S.C. § 1677g(a)(1)–(2).

[28]        This defense presents a particularly good example of why the *Utex* rule represents good commercial sense.  Were the Government's finality claim to be credited, in order to dispute the relatively small amount represented by the amount of § 1677g interest Customs mistakenly charged the importer, AHAC would have been required to pay the full amount of the regular duties and antidumping duties charged at liquidation.  As the *Utex* court explained

Sentry states, without contravention, that protest and advance payment of liquidated damages were not required of defendants in a district court action for damages, prior to enactment of the Customs Courts Act of 1980, which transferred jurisdiction of actions on a surety bond from the district courts to the Court of International Trade, 28 U.S.C. § 1582.  There is no suggestion in the legislative history that Congress intended to change the status of the surety in such suits.

*Utex*, 857 F.2d at 1414.

Here, the Government seeks pre-liquidation interest pursuant to § 1677g only on the entries in court number 09-491.  Pl.'s Resp. Br. 39.  According to the Government, it is entitled to such interest on the underpayment of the deposit made by the importers when their merchandise entered the United States solely because: (1) the interest charge was included in the bill sent to AHAC; (2) the amounts contained in this bill were the subject of a protest, and (3) the protest denial was not appealed to this Court.  Thus, according to the Government, the interest charge became "final and conclusive" by operation of § 1514(a).

Before the court, the Government concedes that, in fact, it is not owed the money and that the charge was erroneously included in the bill.  *See* Pl.'s Resp. Br. 39 n.42 ("But for the 'final and conclusive' nature of the 19 U.S.C. § 1677g interest charge in case 09-491, the Government would not be entitled to interest under 19 U.S.C. § 1677g under these facts.  The Government concedes that AHAC does not owe 19 U.S.C. § 1677g interest in cases 09-401, 09-442, 10-002, 10-003, 10-311, and 11-206.").  In other words, the Government concedes that, were the court to reject its "final and conclusive" argument and find that AHAC can argue that plaintiff is not owed this interest, no claim for § 1677g interest in this action would lie.

The court has found that AHAC is not precluded from raising its affirmative defenses in this contract action before the court.  Thus, the interest charges, including the § 1677g interest, are not final and conclusive by reason of AHAC's decision not to file suit following Customs' protest denials.  Further, the Government is not entitled to pre-liquidation interest under § 1677g for the entries at issue in court number 09-491.  Accordingly, plaintiff's claim for interest under § 1677g in this action is dismissed.

**B.  Plaintiff Is Entitled to Statutory Interest Pursuant to § 1505(d)**

The Government argues it is entitled to post-liquidation interest in accordance with the

provisions of § 1505(d)[29] on all of the entries at issue in this action.  *See* Pl.'s Resp. Br. 39–40.

Plaintiff maintains it is entitled to § 1505(d) interest because "an unpaid balance remain[ed] on

[the] entr[ies] 30 days after liquidation."  Pl.'s Br. 40.

As to this claim, AHAC contends: (1) the Government has waived statutory interest

under § 1505(d) below the bond limits because plaintiff made no reference to interest under this

provision in its motion for summary judgment, despite its reference to such interest in its

complaint; and (2) § 1505(d) applies only to post-liquidation interest on customs duties and is

therefore "inapplicable to prejudgment interest relating to antidumping duties."  *See* Def.'s Br.

11; Def.'s Resp. Br. 13.

The court finds AHAC's arguments unavailing and holds that the Government is entitled

to statutory post-liquidation interest pursuant to § 1505(d).

As an initial matter, AHAC's argument that the Government waived its recovery of post-

liquidation statutory interest under § 1505(d) on all of the bonds is unconvincing.  "A waiver is

[ordinarily evidenced by] an intentional relinquishment or abandonment of a known right or

privilege."  *Yantai Xinke Steel Structure Co. v. United States*, 38 CIT __, __, Slip Op. 14-38, at

18 (2014) (alteration in original) (internal quotation marks omitted) (quoting *NSK Ltd. v. United*

---

[29]     Section 1505(d) reads:
         If duties, fees, and interest determined to be due or refunded are not paid in full
         within the 30-day period specified in subsection (b) of this section, any unpaid
         balance shall be considered delinquent and bear interest by 30-day periods, at a
         rate determined by the Secretary, from the date of liquidation or reliquidation
         until the full balance is paid.  No interest shall accrue during the 30-day period in
         which payment is actually made.
19 U.S.C. § 1505(d).

*States*, 28 CIT 1535, 1555, 346 F. Supp. 2d 1312, 1330 (2004)).  "[A] trial court's decision

whether or not to find waiver [, however,] is discretionary . . . ."  *Woods v. DeAngelo Marine*

*Exhaust, Inc.*, 692 F.3d 1272, 1279 (Fed. Cir. 2012).

The Government clearly did not intend to abandon its claimed right to post-liquidation

interest under 19 U.S.C. § 1505(d).  Although it does not cite to § 1505(d) in its summary

judgment papers, it seeks recovery from AHAC on the bonds as a result of the importers' failure

to pay interest.  Indeed, in its summary judgment brief, as part of its requested relief, it seeks to

recover post-liquidation interest on the bonds.  *See* Pl.'s Br. 6 ("Because the importers failed to

pay, pursuant to the terms of the bonds, AHAC is liable up to the amounts of the bonds for the

importers' defaults.  In addition, *AHAC is liable for pre-judgment interest*, post-judgment

interest, equitable interest and interest pursuant to 19 U.S.C. § 580." (emphasis added)).  Further,

the Government specifically sought interest pursuant to § 1505(d) in its Complaint in court

number 09-401.  Moreover, in plaintiff's response brief, the Government argues it "is entitled to

section 1505(d) post-liquidation on all entries, up to AHAC's bond amounts."  Pl.'s Resp. Br. 39.

AHAC does not claim, nor could it, that it did not receive notice that the Government sought to

recover such interest on the bonds, or that it suffered any prejudice as a result of the omission of

any explicit reference in plaintiff's summary judgment brief that the Government sought to

recover post-liquidation interest under § 1505(d).  Thus, the court will consider the

Government's request for § 1505(d) post-liquidation interest.

As to the applicability of the statute itself to the facts of this case, "§ 1505 governs the

payment of duties and fees on entries of imported merchandise.  Once Customs liquidates or

reliquidates an entry, any duties and fees . . . due and owing are payable 30 days after Customs

issues a bill." *United States v. Am. Home Assurance Co.* (*AHAC III*), 39 CIT __, __, Slip Op.

15-88, at 7 (Aug. 19, 2015).  Where, as here, "a bill is not paid in full within the 30-day grace

period, the unpaid balance is considered delinquent and subject to 'post-liquidation interest,'"

which "accrues in 30-day periods from the date of liquidation or reliquidation until the balance is

paid in full, excluding the 30-day period in which the bill is paid." *Id.*.  Subsection (d) provides:

> If duties, fees, and interest determined to be due or refunded are not paid in full
> within the 30-day period specified in subsection (b) of this section, any unpaid
> balance shall be considered delinquent and bear interest by 30-day periods, at a
> rate determined by the Secretary, from the date of liquidation or reliquidation
> until the full balance is paid.  No interest shall accrue during the 30-day period in
> which payment is actually made.

19 U.S.C. § 1505(d).

Recently, in *AHAC II*, the Federal Circuit construed a different interest provision, 19

U.S.C. § 580, which provides "[u]pon all bonds, on which suits are brought for the recovery of

duties, interest shall be allowed, at the rate of 6 per centum a year, from the time when said

bonds became due," and found this provision encompassed antidumping duties.  *See* 19 U.S.C.

§ 580; *United States v. American Home Assurance Co.* (*AHAC II*), 789 F.3d 1313, 1324 (Fed.

Cir. 2015).  "Thus, by the statute's plain terms, it covers, among other things, bonds securing the

payment of antidumping duties when the [G]overnment sues for payment under those bonds."

*Id.* (citing *Camargo Correa Metais, S.A. v. United States*, 200 F.3d 771, 773 (Fed. Cir. 1999) ("If

the words are unambiguous, no further inquiry is usually required.")).  The *AHAC II* Court

examined the plain language of the provision and found it was "a short, free-standing statute,"

"d[id] not cross-reference other statutory provisions," and "[t]he language—'all bonds' on which

the [G]overnment sues for the recovery of duties'—is clear and unqualified." *Id.*

Similar to § 580, the word "duties" in § 1505(d) is clear and unqualified.  Further, there is

nothing in the statute or its legislative history suggesting Congress intended the meaning of the

term "duties" to "'bear some different import.'"  *See id.* (quoting *Indian Harbor Ins. Co. v.*

*United States*, 704 F.3d 949, 954 (Fed. Cir. 2013) ("In reviewing the statute's text, we give the

words their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." (internal quotation marks and citation omitted))).  The statute plainly provides for post-liquidation interest on all unpaid duties, including special duties such as antidumping duties.

Thus, the court holds that AHAC is liable for § 1505(d) post-liquidation interest in this consolidated action.

### C.  Plaintiff Is Entitled to Statutory Interest Pursuant to § 580

In addition to the principal owed on the bonds, the Government seeks an award of statutory prejudgment interest pursuant to 19 U.S.C. § 580.  *See* Pl.'s Br. 13–16.  Section 580 provides "[u]pon all bonds, on which suits are brought for the recovery of duties, interest shall be allowed, at the rate of 6 per centum a year, from the time when said bonds became due."  19 U.S.C. § 580.  For plaintiff, as part of its recovery for "unpaid antidumping duties under surety bonds issued by AHAC, [it] is entitled to collect interest at the rate of 6 percent per year from the date on which the Government first made formal demand upon the surety."  *See* Pl.'s Br. 13.

AHAC disputes liability under § 580, claiming such interest is unavailable to the Government because "Congress did not intend [for] the 1799 statute now codified at 19 U.S.C. § 580 to apply to antidumping duty bonds, as antidumping duties did not exist for over a century after the statute's enactment."  Def.'s Resp. Br. 3.

As noted, however, this question was settled by the Federal Circuit in *AHAC II*, 789 F.3d at 1313.  There, the Court held "§ 580 provides for interest on bonds securing both traditional customs duties and antidumping duties," and thus "the [G]overnment is entitled to statutory prejudgment interest under § 580."  *See id.* at 1324, 1328.  In reaching its holding, the Federal Circuit examined the plain language of § 580 and found the statute to be "short, free-standing . . .

within the Administrative Provisions section of Chapter 3 in Title 19," and that "[i]t d[id] not

cross-reference other statutory provisions."  *See id.* at 1325.  The Court further found the

language of the statute "'all bonds' on which the [G]overnment sues for 'the recovery of duties'"

to be "clear and unqualified."  *Id.*  Because, "[a]s written, the term 'duties' d[id] not modify the

type of 'bonds' on which interest shall be allowed," but rather, "the statute call[ed] for interest on

'*all* bonds,'" the Court found "by the statute's plain terms, it cover[ed], among other things,

bonds securing the payment of antidumping duties when the [G]overnment sues for payment

under those bonds."  *Id.* (quoting 19 U.S.C. § 580).

      In accordance with the Federal Circuit's construction of 19 U.S.C. § 580, the court finds

§ 580 applies to antidumping duties.  Thus, AHAC is liable for such interest on the delayed

payment of the antidumping duties owed under the bonds at issue.

### D.  The Government Is Not Entitled to Equitable Prejudgment Interest

      Next, the court turns to the question of whether the Government is entitled to equitable

prejudgment interest, taking into account the holding that plaintiff is entitled to prejudgment

statutory interest under 19 U.S.C. § 580.  The decision to award equitable prejudgment interest is

"'governed by traditional judge-made principles'" and is "to be exercised at the discretion of the

trial judge."  *Id.* at 1328 (quoting *Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1367

(Fed. Cir. 2005)).  The Government argues it is entitled to equitable prejudgment interest in

excess of the face value of the bonds as compensation for the loss of its ability to use the

amounts owed under the bonds.  Pl.'s Br. 8–12.  AHAC disputes liability for equitable

prejudgment interest on several grounds.

First, AHAC maintains that, because the antidumping duties were subject to the

Continued Dumping and Subsidy Offset Act ("Byrd Amendment" or "CDSOA"),[30] "the funds . . .

[were] deposited into non-interest bearing accounts and then distributed to domestic producers of

products that compete with the applicable imports," and therefore the Government "had no right or

ability to earn a return on the bond amounts that were withheld during the pendency of this

litigation." Def.'s Suppl. Br. in Supp. of its Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ.

J. 1 (ECF Dkt. No. 126) ("Def.'s Suppl. Br."). Therefore, according to AHAC, "the Government did

not lose any use of the money and is [therefore] not entitled to compensation" as it would otherwise

receive "a windfall that it never would have obtained had the bond been paid upon demand." Def.'s

Suppl. Br. 1.

The court finds this argument meritless. As this Court recently held, "[t]he antidumping

duties on the bonds in this case, like any other case not subject to the Byrd Amendment, are

owed to the United States, not to a fund established by the United States." *United States v. Am.

Home Assurance Co.* (*AHAC V*), 39 CIT __, __, Slip Op. 15-120, at 25 (Oct. 28, 2015). In other

words, "although the funds, once collected, may be placed in accounts for distribution to

domestic producers in accordance with the Byrd Amendment, this does not change the fact that

the money is owed to the United States and, once paid, will be paid to the United States." *Id.*;

*see also* Pl.'s Resp. to Def.'s Suppl. Br. 5 (ECF Dkt. No. 135) ("[C]hecks issued for antidumping

---

[30]      Pursuant to the Byrd Amendment, codified at 19 U.S.C. § 1675c (2000),
antidumping duties collected by the United States were paid to "affected domestic producers" of
goods that were subject to antidumping duty orders. *See Pat Huval Rest. & Oyster Bar, Inc. v.
Int'l Trade Comm'n*, 785 F.3d 638, 640 (Fed. Cir. 2015). "The statute defined an 'affected
domestic producer' as a party that either petitioned for an antidumping duty order or was an
'interested party in support of the petition.'" *Id.* (quoting 19 U.S.C. § 1675c(b)(1)(A)).
Although "[t]he Byrd Amendment was repealed in 2006, . . . the repealing statute provided that
any duties paid on goods that entered the United States prior to the date of repeal would continue
to be distributed in accordance with the pre-repeal statutory scheme." *Id.* (citing Pub. L. 109–
171, § 7601(a), 120 Stat. 4, 154 (2006)).

or countervailing duty bills are made payable to the Government, and these checks are not

simply forwarded to [affected domestic producers] for them to deposit.  Rather, after receiving

the funds, the Government computes and distributes the 'continued dumping and subsidy

offset.'").  Hence, because the funds are owed to the United States itself, and not to a particular

account, the Byrd Amendment is not a bar to the Government's entitlement to equitable interest.

The only remaining question is whether, as a consequence of AHAC's default, the

balance of the equities weighs in favor of the Government's entitlement to equitable prejudgment

interest in excess of the bond limits in this case.  In determining whether to grant an award of

equitable prejudgment interest, full compensation, including the time value of money, should be

the court's primary concern.  *See AHAC II*, 789 F.3d at 1329; *see also West Virginia v. United

States*, 479 U.S. 304, 310 n.2 (1987) ("Prejudgment interest serves to compensate for the loss of

use of money due as damages from the time the claim accrues until judgment is entered, thereby

achieving full compensation for the injury those damages are intended to redress.").  In other

words, as this Court has recently held, "if the United States has been compensated for the time

value of money by another provision, it is difficult to see why it should collect an amount for this

purpose again."  *See AHAC V*, 39 CIT at __, Slip Op. 15-120, at 27; *see also United States v. Am.

Home Assurance Co. (AHAC IV)*, 39 CIT __, __, Slip Op. 15-112, at 6 (Sept. 30, 2015); *AHAC

III*, 39 CIT at __, Slip Op. 15-88, at 17.  In addition, when awarding the Government

prejudgment statutory interest under 19 U.S.C. § 580, the Federal Circuit noted that, where, as

here, a statute governs the award of prejudgment interest, "the award of prejudgment interest [is]

an equitable determination to be exercised at the discretion of the trial judge."  *AHAC II*, 789

F.3d at 1328.

Because, due to § 580, this case does not involve the absence of a statute, the court holds

that the Government is not entitled to an award of equitable prejudgment interest.  The law is

clear that the purpose of equitable interest is to ensure that a party is fully compensated for the

time period during which it is deprived of the use of its funds.  *See United States v. Imperial*

*Food Imps.*, 834 F.2d 1013, 1016 (Fed. Cir. 1987).  Because the Government will be fully

compensated by the statutory prejudgment interest it will receive by means of § 580, the balance

of the equities here tips in favor of AHAC, and against an award of equitable prejudgment

interest.  "In other words, it would be inequitable to award the United States *both* statutory

prejudgment interest under 19 U.S.C. § 580 *and* equitable prejudgment interest under the

principles of equity."  *AHAC V*, 39 CIT at __, Slip Op. 15-120, at 27.  Indeed, this Court has

observed that the statutory equitable prejudgment interest plaintiff will receive under § 580

exceeds any discretionary equitable prejudgment interest award the United States would

otherwise receive:

> Between the relevant dates (Customs' October 2, 2005 demand and the court's
> January 23, 2014 judgment), the short-term funds rate varied between 0.18% and
> 5.16%.  The average rate was 1.77%.  As a result, the 6% rate that the
> Government received under § 580 "more than fairly compensates the [United
> States] for the time value of the unpaid duties.  To award pre-judgment equitable
> interest in these circumstances would overcompensate the Government."

*AHAC IV*, 39 CIT at __, Slip Op. 15-112, at 6 (quoting *AHAC III*, 39 CIT at __, Slip Op. 15-88,

at 17); *see also AHAC V*, 39 CIT at __, Slip Op. 15-120, at 24–28.

Accordingly, in view of the court's holding that the Government is entitled to

prejudgment statutory interest under 19 U.S.C. § 580, plaintiff may not also recover equitable

prejudgment interest in this case.


### E.  Plaintiff Is Entitled to Post-Judgment Interest

Last, the Government maintains it is entitled to post-judgment interest pursuant to 28

U.S.C. § 1961(a), which provides that "[i]nterest shall be allowed on any money judgment in a

civil case recovered in a district court." *See* Pl.'s Br. 16; 28 U.S.C. § 1961(a).  Although § 1961

does not apply directly to the Court of International Trade, the Federal Circuit has confirmed this

Court's ability to award post-judgment interest at the rate set forth in § 1961 based on 28 U.S.C.

§ 1585, which provides that "[t]he Court of International Trade . . . posses[es] all the powers in

law and equity of, or as conferred by statute upon, a district court of the United States." *See*

*Great Am. II*, 738 F.3d at 1325–26; 28 U.S.C. § 1585.

AHAC does not object to an award of post-judgment interest, nor could it.  "Post-

judgment interest is not discretionary, but rather is available as a matter of right to prevailing

parties." *AHAC III*, 39 CIT at __, Slip Op. 15-88, at 19.  Thus, to the extent the Government has

prevailed in this matter by means of an award of a money judgment against AHAC, plaintiff is

entitled to post-judgment interest at the rate set forth in § 1961, calculated from the date of entry

of the judgment.  *See* 28 U.S.C. § 1961; *AHAC III*, 39 CIT at __, Slip Op. 15-88, at 19–20.

## CONCLUSION

Based on the foregoing, the court grants, in part, plaintiff's motion for summary

judgment, and grants, in part, defendant's cross-motion for summary judgment.  Regarding the

Government's interest claims for recovery on the bonds, the court grants its requests for (1)

prejudgment statutory interest under 19 U.S.C. § 580, (2) 19 U.S.C. § 1505(d) post-liquidation

interest, and (3) post-judgment interest at the rate set forth in 28 U.S.C. § 1961.  The

Government's requests, however, for (1) pre-liquidation interest under 19 U.S.C. § 1677g on the

entries at issue in court number 09-491, and (2) equitable prejudgment interest are denied.  In

addition, plaintiff may not collect any antidumping duties on thirty of the seventy-nine entries of

fresh garlic at issue in court number 10-311 that were subject to the notices of rescission.

Finally, because both parties' motions for summary judgment are denied with respect to AHAC's

defense of prejudice, this issue will be decided at trial.

Dated:          December 17, 2015
                New York, New York


                                                    s\ Richard K. Eaton
                                         _____
                                                    Richard K. Eaton